UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: _____

H. SCOTT SHORE,

    Plaintiff,

vs.

THE HEBREW DAY SCHOOL OF
BROWARD COUNTY, A PRIVATE
SCHOOL, INC., d/b/a THE DAVID
POSNACK JEWISH DAY SCHOOL,

    Defendant.
_____/

## Complaint – Jury Trial Demanded

Plaintiff, H. Scott Shore, sues Defendant, The Hebrew Day School of Broward County, and alleges as follows:

### Introduction

1. This is a disability discrimination and retaliation action brought by Mr. Shore, who as an adolescent was diagnosed with a learning disorder, but who time and again overcame those challenges to achieve an Ivy League education and a distinguished career. After teaching with Defendant for over a decade, he requested an accommodation to assist with increasing technology demands in the classroom. His request was ignored and he was forced to file a complaint with the EEOC. Six weeks later, the School fired him under the guise of performance issues. He sues under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* He seeks injunctive relief, damages, attorney's fees and litigation expenses.

**Jurisdiction, Venue, Parties and Conditions Precedent**

2. This Court has jurisdiction over Mr. Shore's claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. 12117. This Court has jurisdiction to grant declaratory and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because the events and omissions giving rise to the claims occurred in Broward County, Florida, where Mr. Shore was employed.

4. Mr. Shore at all times material was an "employee" as envisioned by 42 U.S.C. § 12111(4) and a "qualified individual" as envisioned by 42 U.S.C. § 12111(8).

5. Defendant is a Florida non-profit corporation with its principal place of business in Broward County, Florida. It is an "employer" as envisioned by 42 U.S.C. § 12111(5)(a), and a "covered entity" as envisioned by 42 U.S.C. § 12111(2).

6. Mr. Shore timely filed a charge of discrimination with the Equal Employment Opportunity Commission and this action is filed within 90 days of his receipt of the notice of rights to sue. All conditions precedent to the maintenance of this action have been performed or waived.

**General Allegations**

7. As an adolescent Mr. Shore was diagnosed with dyslexia and attention deficit disorder. Dyslexia is a learning disorder that affects areas of the brain that process language. These mental impairments substantially limit various life activities for Mr. Shore, including his ability to read, process, organize and sequence information.

8. Mr. Shore attended grade school at McGlannan School in Miami, a school that provides one-on-one learning opportunities for children with dyslexia and other learning disabilities.

9. After finishing high school, Mr. Shore attended Harvard University, graduating with honors and receiving a bachelor's degree in history.

10. After leaving Harvard, Mr. Shore was awarded a Rotary International fellowship to study abroad and attended the University of Sussex in England, where he received a master's degree in international relations.

11. Mr. Shore then went on to study at Columbia Business School in Manhattan, where he received a master of business administration degree.

12. Mr. Shore's professional career includes roles at: Bain & Company as a senior consultant; Booz Allen Hamilton as a managing principal; the Overseas Private Investment Corporation as vice president of policy, and; Oppenheimer & Co. Inc. as an investment banking analyst. He also taught as a professor at Babson College and Bentley University.

13. In 2007, Mr. Shore left New England and moved to Florida where he began teaching at the Hebrew Day School of Broward County.

14. Until a few years ago, Mr. Shore was a full-time instructor and taught classes such as AP History, AP European History, AP Government, AP Economics, World History and International Relations.

15. Mr. Shore established the School's forensics program to include Speech and Debate, Mock Trial, and Moot Bein Din programs, where he served as a coach and mentor to scores of students.

16. In or around 2017, after the school began implementing new software applications in the classroom, Mr. Shore met with the School's principal (Gayle Green) and head of learning resources (Ashira Drury) and requested an accommodation. He explained that, as a result of his dyslexia and ADD, the new software applications were erecting barriers for him that he had traditionally overcome in the past. The sequencing of tasks and processing of information in an increasingly electronic format, he explained, was proving challenging for him. He asked whether a student teacher's assistant could help or whether any IT training or assistance resources could be made available to him. Ms. Drury recommended that the school's IT department be involved in creating a structured plan to address Mr. Shore's needs. She also agreed that a student assistant could be part of a helpful solution. Ms. Green dismissed the issue and told Mr. Shore he should just contact the School's IT department whenever issues arise.

17. Around the same time, the School pushed Mr. Shore to a part-time role and took away his forensics program responsibilities.

18. Meanwhile, through bi-annual performance evaluations, Ms. Green began critiquing Mr. Shore's technological proficiency. According to the School's handbook, teacher performance is measured by "8 Domains of Excellent Teaching at Posnack School." One of the eight domains is "Technology," which purports to measure, among other things, whether a teacher: Uses technology to individualize instruction; Includes the use of technology in weekly lesson plans, for instruction, and to manage student data; Encourages students' use of technology for homework, classwork, presentations, and projects; Uses technology to incorporate creativity into lessons and to increase the level of student engagement, and; Brings a variety of interactive technology options into the classroom.

19. During meetings to discuss these critical performance reviews, Mr. Shore repeated his requests for assistance with technology expectations on account of his disability, to no avail.

20. In May 2019 Mr. Shore met with head of school Dr. Richard Cuenca and conveyed his displeasure with being pushed to a part-time role and his frustration with Gayle Green, who he believed had been targeting him and subjecting him to a hostile work environment. Dr. Cuenca was sympathetic and said that by marginalizing Mr. Shore, the school had squandered opportunities to expand creative and critical thinking for students in the classroom. He proposed for Mr. Shore an academic dean or dean of studies position with the School, stating that such a role would be well suited for Mr. Shore's background and experience. Dr. Cuenca envisioned this as a full-time position, but stated that he would need to work out the details and promised to follow-up once he did. Mr. Shore conveyed a sense of relief and left the meeting feeling optimistic about his future with the School.

21. His optimism was short-lived. After that meeting, Ms. Green broke the news to Mr. Shore that his teaching contract would not be renewed as there apparently were no teaching opportunities for him.

22. Meanwhile, the School had advertised for a full-time high school social studies position. Confused about the mixed signals, Mr. Shore applied for the position but was rejected. Many of the classes that he had taught for over a decade were now being taught by less qualified individuals.

23. For the 2019-20 academic year, the School ultimately offered Mr. Shore a part-time role teaching Judaism 101 and AP Microeconomics.

24. For the 2019-20 academic year, Ms. Green left her role as principal and assumed the position of in-house counsel. She was replaced by Brooke Rosenkrantz.

25. In December 2019 Mr. Shore met with Ms. Rosenkrantz for a performance review. Ms. Drury from learning resources also attended the meeting. Mr. Shore's struggles with technology applications in the classroom were again raised, and he again reiterated that he had asked for assistance on account of his struggles with dyslexia, but his requests had been ignored by Ms. Green.

26. Following the meeting, Mr. Shore sought assistance from Niva Albourkrek, who worked in the School's IT department. Ms. Albourkrek then conveyed his request for assistance to Ms. Green, who penned a "CYA" email in which she feigned ignorance of the entire ordeal:

> As in-house counsel for the school, Niva shared your email to her with me, in which you request assistance with technology. . . . Based on information and belief, you have not previously advised the school of these conditions in your 12 years of employment and thus, this is the first time that the school has learned of these conditions and the first time you have requested accommodations for these conditions.

27. By February 2020, after the school still had not provided to Mr. Shore any accommodation, he filed a complaint with the EEOC.

28. Two days after the School learned of his EEOC complaint, Ms. Rosenkrantz conducted a classroom observation, during which she joined and observed Mr. Shore's AP Economics class. The observation was conducted on a Friday afternoon, with approximately ten minutes left of class time remaining, when students had just finished two days of AP economics testing. Ms. Rosenkrantz warned Mr. Shore that he was not using class time effectively and stated that he was not meeting instructional expectations.

29. Mr. Shore filed a second charge of discrimination with the EEOC following Ms. Rosenkrantz's retaliatory classroom observation.

30. Meanwhile, Ms. Green had finally scheduled a meeting to discuss Mr. Shore's accommodation request. Moments before the March 2020 meeting was scheduled to take place, she relayed to Mr. Shore that an attorney from the School's Board of Trustees, Sharon Kaplan, would be participating. Ms. Kaplan took the lead during the conference and turned what should have been a standard meeting about an accommodation request into a combative cross-examination.

31. On Thursday April 2 Ms. Green sent an email notifying Mr. Shore that the School had finally agreed to provide assistive technology to help with Mr. Shore's struggles with dyslexia.

32. Just four days later—while Mr. Shore was teaching remotely due to the COVID-19 pandemic restrictions—Ms. Rosenkrantz advised that the School would not extend to him a teaching contract for the upcoming school year. The decision, she claimed, was based on Mr. Shore's "performance this year" as well as "several complaints" received from parents and students.

## Count I – Failure To Accommodate Under The ADA

33. Mr. Shore realleges and incorporates by reference, as if fully set forth herein, paragraphs 1-31 of this Complaint.

34. Mr. Shore is a qualified individual with a disability under the ADA.

35. The School violated the Americans with Disabilities Act by refusing to provide Mr. Shore with reasonable accommodations in the work place. The School also failed to engage in the interactive process required by the ADA to provide an accommodation.

36. The discriminatory actions of the School hindered Mr. Shore's ability to perform his job as a teacher, which led to negative performance evaluations, a demotion to part-time

status, being passed over for promotional opportunities, and eventually his termination, as more fully described above.

37. The School's actions have caused and continue to cause Mr. Shore to suffer damages, including damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses in an amount to be established at trial.

38. Because of the School's flagrant disregard of Mr. Shore's federally protected rights against disability discrimination, Mr. Shore is entitled to recover punitive damages to punish the School for its behavior.

39. WHEREFORE, Plaintiff, H. Scott Shore, respectfully demands judgment against Defendant, any and all available relief under the ADA including, but not limited to back pay, reinstatement or front pay, compensatory damages, attorneys' fees and costs, prejudgment interest and such other relief as this Court deems just and proper.

## Count II – Disability Discrimination Under The ADA

40. Mr. Shore realleges and incorporates by reference, as if fully set forth herein, paragraphs 1-31 of this Complaint.

41. After learning of Mr. Shore's disability, the School through its agents and employees began discriminating against Mr. Shore, to include negative performance evaluations, a demotion to part-time status, and eventually his termination, as more fully described above.

42. The School violated the ADA by intentionally discriminating against Mr. Shore on the basis of his disability, and/or his perceived disability, and/or for having a record of such disability.

Case 0:20-cv-61235-RKA   Document 1   Entered on FLSD Docket 06/24/2020   Page 9 of 10

43. The School's actions have caused and continue to cause Mr. Shore to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses in an amount to be established at trial.

44. Because of the School's flagrant disregard of Mr. Shore's federally protected rights against disability discrimination, Mr. Shore is entitled to recover punitive damages to punish the School for its behavior.

45. WHEREFORE, Plaintiff, H. Scott Shore, respectfully demands judgment against Defendant, any and all available relief under the ADA including, but not limited to back pay, reinstatement or front pay, compensatory damages, attorneys' fees and costs, prejudgment interest and such other relief as this Court deems just and proper.

## Count III – Retaliation Under The ADA

46. Mr. Shore realleges and incorporates by reference, as if fully set forth herein, paragraphs 1-31 of this Complaint.

47. Mr. Shore engaged in protected activity when he requested a reasonable accommodation and when he opposed the School's discriminatory treatment and unlawful employment practices.

48. The School intentionally retaliated against Mr. Shore because of his request for an accommodation and/or because of his opposition to the School's unlawful employment practices.

49. The School's actions have caused and continue to cause Mr. Shore to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses in an amount to be established at trial.

50. Because of the School's flagrant disregard of Mr. Shore's federally protected rights against disability discrimination, Mr. Shore is entitled to recover punitive damages to punish the School for its behavior.

51. WHEREFORE, Plaintiff, H. Scott Shore, respectfully demands judgment against Defendant, any and all available relief under the ADA including, but not limited to back pay, reinstatement or front pay, compensatory damages, attorneys' fees and costs, prejudgment interest and such other relief as this Court deems just and proper.

### Jury Trial Demand

Plaintiff demands trial by jury on all issues so triable.

Dated this 24th day of June, 2020.

Respectfully submitted,

Brenton Legal P.A.
*Counsel for Plaintiff*
1070 E. Indiantown Rd., Suite 400
Jupiter, FL 33477
Phone: 954-639-4644

By: /s/ Ryan C. Brenton

Ryan C. Brenton
Florida Bar No.: 107675
rcb@brentonlegal.com